This appeal is from a judgment of the Hudson County Court affirming an award of compensation to the dependents of Charles E. Temple, age 35, who died on November 30, 1945.
Decedent entered the employ of Storch Trucking Company as a truck driver in July 1945 and continued as such until November 1st when he was out of employment for almost four weeks. He resumed his employment in the same capacity on November 28th. The following day he worked from 7 A.M. to 7 P.M. That evening he came home in poor condition and about midnight had "an awful pain" in his chest. After retiring, he had a recurrence in the early morning. He arose at 5:30 A.M. and reported for work at 7 A.M. at which time he said that he felt fine. A Mr. Harvie, the truck dispatcher for the defendant, assigned decedent to take a 7 1/2 ton trailer, loaded with some 15 tons of material, to Brooklyn. The trailer was parked in an open lot and during the previous night there had been a snowfall of 2.8 inches. In order to hitch the tractor to the trailer, it was necessary for the driver to maneuver the tractor under the trailer to couple them. Because of the freshly fallen snow and in order to get traction on the driving wheels of the tractor, it was necessary to shovel or scrape the snow from under the rear wheels to uncover an area about two feet long by a foot wide. The decedent, Harvie and a fellow-worker, Spencer, each did some shovelling. The decedent also procured ashes or cinders and spread them three or four times under the rear wheels of the tractor. After the tractor and trailer were hitched up, it was the task of someone to grind up the pony wheels which support the forward end of the trailer when not hitched to a tractor. This is done by some 20 or 25 revolutions of a hand crank and in cold weather it was, according to the witness Harvie, quite a job. Neither Harvie nor Spencer *Page 148 
rolled up the pony wheels from which it is a permissible inference that the decedent did so. On the morning in question, the hitching of the tractor to the trailer took about 20 minutes because of the condition of freshly fallen snow, as against five or 10 minutes under normal conditions. In maneuvering the tractor beneath the trailer, it was necessary for decedent to climb in and out of the tractor a number of times. After the two were hitched up, the decedent drove to the Holland Tunnel, Spencer riding with him as a passenger. This took approximately a half hour because of the snow conditions, as against 10 or 15 minutes under normal conditions. On the way to the tunnel, the decedent told Spencer of the pain that he had had the previous night. Other than that he made no complaint as to his physical condition. When some two-thirds of the way through the tunnel, the deceased, without warning, collapsed and died shortly thereafter.
The medical testimony is of importance and we quote therefrom at some length.
Dr. Bernstein called by petitioner was posed a lengthy hypothetical question which, inter alia, embraced the hypothesis that "while Mr. Temple was driving his tractor and trailer as described over Henderson Street, a period of about five to fifteen minutes from the time he left the lot on Montgomery Street, he complained to George Spencer, who was riding with him on the tractor, that he had a pain in the chest * * *". The deputy commissioner, over objection, permitted this hypothesis to remain although the witness George Spencer had clearly stated that the pain of which decedent told him was not a then existing pain. Spencer's testimony was "he told me he had it the previous night." The importance of this bit of evidence lies in the fact that it was a bridging symptom between the exertion which the decedent underwent in the parking lot and the fatal onset in the Holland Tunnel. That the doctor relied upon this symptom in arriving at the conclusion that there was "a definite causal relationship between the effort in which he engaged that morning in getting the tractor hooked up to the trailer and the myocardial infarction which ensued and his death" is demonstrated in his cross-examination. *Page 149 
"Q. What symptoms have you in the morning, Doctor, on which you base your diagnosis of myocardial infarction? A. The symptom was the pain in the chest of which the man complained while driving along. * * *
"Q. Doctor, with an impending catastrophe such as we have in this case you would expect, would you not, as you have so often testified, that upon exertion of the moment there would be immediate symptoms in the petitioner recognizable by others and by himself? A. What I have testified to again and again is that if the symptoms come on within fifteen or twenty minutes of the time of the exertion there is causal relationship, a reasonable probability that they were related.
"Q. All right, What are those symptoms? A. There may only be chest pain and death. There may be shortness of breath, there may be collapse; there may not be.
"Q. You expect symptoms, don't you, Doctor, upon exertion? A. Well — you mean immediately. As I say —
"Q. Maybe within five or ten minutes. A. Or fifteen or twenty minutes, yes, and the symptoms may be chest pain and death, no other symptoms.
"Q. And you would not take this over twenty minutes, would you? A. I would hesitate beyond that point. I mean, some men feel that one can include — go as high as an hour.
"Q. Just you, Doctor. A. I feel it has to be within twenty minutes, a half hour tops. I would not go beyond that point.
"Q. You are definitely of the opinion that you would expect some symptoms upon the exertion or within twenty minutes after? Within twenty minutes.
"Q. Even if it would be only chest pain? A. That is right. * * *
"What I said was that the beginning onset of this must begin within twenty to thirty minutes — whether it is pain, whether it is beginning collapse, whether it is any of the symptoms that happen in death itself. That may take longer, but what I said was that the onset of the ultimate death must begin within twenty to thirty minutes of the effort, and the onset may just be chest pain, peculiar feeling, or inability to drive the truck, *Page 150 
or whatever it was. Death itself does not have to occur within that period.
"Q. All right. So that if we do not have the onset, so to speak, as you call it, the pain in the chest, and we do not have any bridging there between the last exertion and his death, then I understand you subscribe to the theory that it will not be related. A. I think it would be less probable."
Dr. Jerome Kaufman was called by the respondent. In part his examination was as follows:
"Q. What symptoms would you look for where the effort of the moment has overtaxed the heart? A. Severe constricting pain in the midchest, shortness of breath, sweating, weakness, weakness to collapse, ashen gray appearance, and so forth.
"Q. And if any of the work that the petitioner had performed up to 7:45 A.M. on that morning before he left the yard with the trailer had any effect upon his heart and his subsequent death, the symptoms would have appeared immediately? A. That is correct.
"Q. And he would be, in your opinion, would he not, unable from that point on to continue with his employment? A. That is right.
"Q. What in your opinion, Doctor, is the longest time element for these symptoms to appear if they are the result of the effort expended by the decedent? A. In my opinion those symptoms should appear immediately or immediately thereafter, and certainly that should be within a very few moments."
Dr. Asher Yaguda testified in part as follows:
"In my opinion there is no causal connection or aggravating factor in the efforts that he performed that morning up until the time that he left the yard at 7:45 and I say that for this reason, that all of these efforts individually and collectively were not sufficient to bring on an attack of coronary insufficiency which would have indicated that not enough blood was able to come through to nourish the heart, and this most certainly would have occurred if there had been any influence of that effort on the heart, because —
"Q. Why, Doctor? A. Because of this, that so long as the heart is able to get sufficient blood to its muscle to nourish *Page 151 
it and to supply the oxygen necessary for this effort, he has no symptoms, and if there are no symptoms showing that he was not able to get sufficient blood through and sufficient oxygen through, then there can be no damaging effect of that effort on the heart muscle."
The appellant argues that death was not the result of an accident arising out of and in the course of the employment. The deputy commissioner in awarding compensation found "that the petitioner has established the greater weight of probability that the employment caused an unusual strain upon the decedent, resulting in his death." On appeal, the County Court found that death resulted from an accident arising out of and in the course of the employment and adjudged the case to be clearly within the principle laid down by Molnar v. American Smelting RefiningCo., 127 N.J.L. 118 (Sup.Ct. 1941); Hentz v. Janssen DairyCo., 122 Id. 494 (E. A. 1939); Ciocca v. National SugarRefining Co., 124 Id. 329 (E. A. 1939); Bollinger v.Wagaraw Building Supply Co., 122 Id. 512 (E. A. 1939). Neither Ciocca v. National Sugar Refining Co., supra, norBollinger v. Wagaraw Building Supply Co., supra, was a case involving a heart condition, which, in our judgment, is sufficient to distinguish them from the instant case. As toMolnar v. American Smelting Refining Co., supra and Hentz v.Janssen Dairy Co., supra, we had occasion in Grassgreen v.Ridgeley Sportswear Mfg. Co., 2 N.J. Super. 62 (App.Div.
1949) to point out that the decisions in both of these cases were predicated upon a finding of unusual effort or strain. In the instant case, there was no event or happening "beyond the mere employment itself" which brought about the final result.Iohndorf v. Peper Bros. Paint Co., 134 N.J.L. 156 (Sup.Ct.
1946), affirmed on the opinion below 135 Id. 352 (E. A.
1947). The most that can be said in the instant case is that the decedent died of a myocardial infarction a half hour after having performed certain labors connected with his employment, included among which was the very hard, but not unusual task, of cranking up the pony wheels. Even conceding that on the day of his death, the rolling up of the pony wheels was hard labor, it was nevertheless a usual task in his employment and *Page 152 
was not, in the language of the Lohndorf case, an event or happening beyond the mere employment itself, nor was it an unlooked for mishap or untoward event neither expected nor designed. Geltman v. Reliable Linen Supply Co., 128 N.J.L. 443 (E. A. 1942). Even conceding that there was an unusual strain or exertion performed by the decedent between the time of his arrival at work at 7 o'clock and the fatal seizure at 8:15, there was no evidence, objective or subjective, of any symptom of a cardiac disturbance between the time when he left the yard at 7:45 and his death at 8:15. The medical testimony in this case is overwhelming that there must be bridging symptoms between the exertion alleged to have caused the injury to the heart and the onset of the attack. Dr. Bernstein found such a symptom in the pain in the decedent's chest of which he is said to have complained while en route to the Holland Tunnel but as we have pointed out heretofore there was no such pain. Dr. Kaufman listed the symptoms which one would expect to follow after effort which overtaxed the heart as severe pain in the chest, shortness of breath, sweating, weakness and ashen gray appearance. None of these was present and as explained by Dr. Yaguda "if there are no symptoms showing that he was not able to get sufficient blood through and sufficient oxygen through, then there can be no damaging effect of that effort on the heart muscle." In order to recover compensation in a case of coronary collapse, some symptoms of damage to the heart must be manifested immediately or a short time after the unusual exertion said to have caused the coronary collapse. In this case there was a complete absence of such bridging symptoms between the exertion and the collapse more than a half hour later, and in the absence of such bridging symptoms, it cannot be said that the death was caused by accident arising out of and in the course of the employment.
 For the reasons stated, the judgment is reversed. *Page 153