17 N.J. Super. 217 (1952)
85 A.2d 539
KATIE BECKER, PETITIONER-APPELLANT,
v.
CITY OF UNION CITY, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, RESPONDENT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 10, 1951.
Decided January 4, 1952.
*221 Before Judges McGEEHAN, JAYNE, and WM. J. BRENNAN, JR.
Mr. John A. Laird argued the cause for appellant (Mr. Lawrence Wolfberg, attorney; Mr. David Roskein, on the brief).
Mr. Cyril J. McCauley argued the cause for respondent.
The opinion of the court was delivered by JAYNE, J.A.D.
There appears to be a somewhat persistent endeavor on behalf of claimants to induce us either to displace or materially to liberalize the application of the existing principle of law relative to the so-called "heart cases" prosecuted in pursuance of the terms and provisions of the Workmen's Compensation Act, R.S. 34:15-7 et seq.
It is the peculiar genius and strength of the law that no decision is stare decisis when it has lost its usefulness in our social evolution. However, one should not be incorrigible in the performance of judicial service. There are certain commandments in the law which must be heeded and respected. Among them is that proclaimed by Chancellor Kent: "When a decision upon a point of law has been made upon solemn argument and upon mature deliberation, the community have a right to regard it as a just declaration or exposition of the law, and to regulate their actions by it." Despite man's modern propensity for innovations, that rule of judicial action has continued to retain its prestige.
"Although it has been said that a precedent embalms a principle, and although I do not assent to the proposition that our courts must abjectly submit to an unqualified enslavement *222 and subserviency to early precedents, yet it would be disastrous frequently to have one law on the same subject in the morning and another at night." Creasey v. Zink, 140 N.J. Eq. 111 (Prerog. Ct. 1947).
Assuredly, the existing state of our decisional law applicable to the consideration of such cases is expressed in Lohndorf v. Peper Bros. Paint Co., 134 N.J.L. 156 (Sup. Ct. 1946), affirmed 135 N.J.L. 352 (E. & A. 1947); Grassgreen v. Ridgeley Sportswear Mfg. Co., 2 N.J. Super. 62 (App. Div. 1949), cert. den. 1 N.J. 603 (1949); Temple v. Storch Trucking Co., 2 N.J. Super. 146 (App. Div. 1949), affirmed 3 N.J. 42 (1949); and Seiken v. Todd Dry Dock, Inc., 2 N.J. 469 (1949), in which it was stated that: "A review of the cases decided since the Lohndorf case, supra, shows a general adherence to the view therein expressed * * *" The verity of that remark is exhibited by the decisions in Gaudette v. Miller, 1 N.J. Super. 145 (App. Div. 1948); Carpenter v. Calco Chemical Div., Amer. Cyanamid Co., 4 N.J. Super. 53 (App. Div. 1949); Franko v. Mack Manufacturing Corp., 5 N.J. Super. 1 (App. Div. 1949); Schroeder v. Arthur Sales Co., Inc., 5 N.J. Super. 287 (App. Div. 1949), affirmed 4 N.J. 116 (1950); Gorelick v. Paramount Slipper Co., Inc., 5 N.J. Super. 406 (App. Div. 1949); Franklin v. U.S. Bronze Powder Works, 6 N.J. Super. 320 (App. Div. 1950); Hoffman v. Krause, 8 N.J. Super. 163 (App. Div. 1950); Martin v. Western Electric Co., Inc., 9 N.J. Super. 89 (App. Div. 1950); Gagliano v. Botany Worsted Mills, 13 N.J. Super. 1 (App. Div. 1951).
An acquaintance with the above cited decisions will reveal that the following principles are firmly sustained in our law:
1. The statutory prerequisites to establish a compensable injury by accident under R.S. 34:15-7 are that the alleged accident arose not only (a) in the course of employment, but also (b) out of the employment. Consult also Hall v. Doremus, 114 N.J.L. 47 (Sup. Ct. 1934); Beh v. *223 Breeze Corporation, 2 N.J. 279 (1949). The words "accident" and "employment" as utilized in the statute are not synonymous. Therefore proof of the fact that injury or death occurred during the course of work does not of itself entitle one to the benefits of that legislation. It must additionally be made to appear that the mishap arose out of the employment. Basically it must be recognized that the statute does not constitute an employer a plenary and unconditional insurer of the health and life of his employees.
2. The burden descends upon the claimant to prove those essential and indispensable elements of his or her claim by a preponderance of the evidence. Parker v. John A. Roebling's Sons Co., 135 N.J.L. 440 (Sup. Ct. 1947), affirmed 136 N.J.L. 635 (E. & A. 1948). This may be accomplished by proof of a circumstantial character which preponderates in favor of the tendered hypothesis by supporting a rational inference founded upon a comparative superiority of probabilities according to the common experience of mankind. Gilbert v. Gilbert Machine Works, Inc., 122 N.J.L. 533 (Sup. Ct. 1939). This burden of proof necessarily embraces the obligation to disclose that the injury sustained by the employee was the proximate result of an accident within the import of the statute. The proof, however, is not required to eliminate all doubt. Ames v. Sheffield Farms Company, 1 N.J. 11 (1948). It is not a valid defense to show that the death could possibly have occurred from natural causes. Probabilities, not possibilities, must control the factual conclusion. Sunkimat v. Senger Coal & Ice Corp., 137 N.J.L. 103 (Sup. Ct. 1948).
3. While it is not necessary that an accidental injury must in order to be compensable be the result of traumatic force, yet an injury, even though fatal, suffered in the course of employment but arising solely from natural causes wholly unrelated to an industrial mishap is not compensable. Common observation and experience have instructed us that there are classes of bodily disabilities which are normally due to pathological causes and more rarely attributable to traumatic *224 misfortunes and so, for example, there is the initial inference that heart failure is the consequence of natural physiological changes. In Joseph Dixon Crucible Co. v. Law, 135 N.J.L. 528 (1947), the former Supreme Court expressed the admonition: "It is requisite that in workmen's compensation cases grounding in alleged heart injuries the evidence be carefully scrutinized and assayed lest disability consequent upon disease alone constitute the basis of an award of compensation."
It is therefore entirely reasonable to expect that in such cases there should be a relatively increased onus probandi resting upon the claimant in order to prove by a preponderance of the probabilities that the employment was a contributing factor to the disability without which the alleged accident would not have occurred. Cf. Schlegel v. H. Baron & Co., 130 N.J.L. 611 (Sup. Ct. 1943); Young v. Sheffield Farms Co., Inc., 136 N.J.L. 489 (Sup. Ct. 1948), affirmed 137 N.J.L. 605 (E. & A. 1948); Tyler v. Atlantic City Sewerage Co., 137 N.J.L. 16 (Sup. Ct. 1948).
4. Accordingly, the rule in effect is that to overcome the inference that a heart ailment is due to natural causes, it is incumbent upon the claimant to produce evidence of an unusual strain or exertion, event or happening incident to but beyond the mere regular employment itself to constitute satisfactory proof of an "accident" within the meaning and signification of the statute.
5. One of the tests invoked in the consideration of these cases has been to inquire whether the employee was acting at the time of the mishap in the pursuit of his customary and routine duty. The serviceability of this test depends largely upon the appropriate adaptability of the adjective "routine" to the nature of the employment. Its logical efficiency must be somewhat discounted in cases involving those types of employment in which the adjective can be little more descriptive than a generalization, notably in its relevancy to the services of firemen and policemen whose occupations embrace the performance of an unpredictable variety of intermittent and contingent duties.
*225 Whatever may be the rational avenue of approach, the basic inquiry in the heart cases is whether upon consideration of the evidence the greater weight of the reasonable probabilities produces the conviction that there was a proximate and efficient causal relationship between the pursuit of the employment and the unexpected and undesigned attack.
An accident is an unlooked for mishap or untoward event which is not expected or designed, an event happening at a specific time or occasion. Bryant, Adm'x. v. Fissell, 84 N.J.L. 72 (Sup. Ct. 1913); Dawson v. E.J. Brooks & Co., 134 N.J.L. 94 (Sup. Ct. 1946). The difficulty experienced by the petitioners in the heart cases inheres not so much in any distinctly different substantive principle of law but in the undertaking to prove that the injury to the heart was in fact accidental in cause and occurrence.
It is in the reflection of the light of those prevailing principles that we undertake the consideration of the present appeal.
On November 7, 1949, one John Becker, a paid fireman who had been regularly employed as such in the fire department of the City of Union City for a period of 20 years, collapsed and died almost immediately after his participation in the extinguishment of a fire in the Manhattan Building situate on Bergenline Avenue in that city. His dependent mother instituted this proceeding to recover an award under the workmen's compensation law. The ascribed cause of her son's death was either acute coronary occlusion or myocardial infarction. An autopsy was not performed. Doctor Stolove, an intern at the North Hudson Hospital who attended the decedent at the scene of the fire, expressed the opinion that excitement, overexertion, inhalation of smoke, and age of 51 years collectively precipitated a fatal coronary occlusion. Doctor Bernstein in response to a hypothetical question attributed the death to a relative anoxia and to the concurrent exertion which cooperatively resulted in myocardial infarction:
*226 "Myocardial infarction means death of a portion of the heart muscle. This can come about in one of several ways. The one that I explained here was anoxia due to a relatively greater demand by the heart muscle than the amount of oxygen which could be supplied by the coronary arteries to that portion of the heart muscle."
Doctor Kaufman, also an expert witness, likewise rejected the diagnosis of coronary occlusion but testified:
"Based on the hypothetical question, I do not believe that there is causal relationship between the fighting of the fire in this case, and the decedent's death; for the following reasons: Number one, I do not believe that beyond speculation one can ascertain the cause of death in this case. Here was a healthy man who became unconscious and died within ten or fifteen minutes, without a complaint of chest pain, or without really an opportunity to give any symptomatology so that an intern could make a diagnosis of coronary occlusion. The mere looking at the body of an unconscious man, the mere examining of an unconscious healthy man, a man who had been healthy and becomes unconscious, does not give an opportunity to make a diagnosis. There is also a discrepancy between Dr. Stolove's diagnosis and the death certificate. A coronary occlusion differs from cardiac syncope due to myocardial failure. Myocardial failure can occur from many things; hypertension; it can be luetic, syphilitic, rheumatic; it can be due to heart disease, arteriosclerosis. It can be due to many things, while coronary occlusion is a definite entity.
I am willing to admit that in so-called sudden deaths fifty per cent of sudden deaths are due to acute coronary occlusion. But, with certainty, that can only be determined by post-mortem examination.
Secondly, assume for the purpose of discussion that he did die from coronary occlusion. I fail to find, in this hypothetical question, any incident of unusual exertion, which could be of a stress incident to be a contributory factor to coronary occlusion. Therefore, I deny that there is a causal relationship between his death and his employment."
Both the deputy director and the judge of the Hudson County Court concluded that the evidence failed adequately to disclose that the decedent's death arose out of his employment.
We realize that leisurely service is not characteristic of the fireman once the alarm is given, and "that despite long service a fireman does not fight any fire free of emotional, *227 physical and nervous stress and strain which are the natural incidents of haste and danger in emergent circumstances," but we hesitate to assume that a fireman who has been actively and continuously engaged in a city fire department for a period of 20 years is ordinarily and on all occasions impassioned by that high degree of curiosity, flair for drama and excitement experienced by the village volunteer or bystander.
True, there have been cases in which the evidence of the circumstances has been sufficiently persuasive to warrant the conclusion that in reasonable probability the physical exertions and activities of the fireman constituted the contributing proximate cause of the heart attack. Illustrations of such factual circumstances may be found in the cases of the volunteer firemen in Fire Commissioners, &c., Moorestown, N.J. v. Morris, 12 N.J. Misc. R. 153 (Sup. Ct. 1934) and Weisenbach v. New Milford, 134 N.J.L. 506 (Sup. Ct. 1946). Cf. Van Ness v. Haledon (police marshal), 136 N.J.L. 623 (E. & A. 1948); Fox v. Plainfield (cerebral hemorrhage), 10 N.J. Super. 464 (App. Div. 1950).
A comparison of the circumstances present in the foregoing cases with those existing in the instant case does exhibit some distinguishable dissimilarity. This decedent did not hasten to dress, speed to the fire house, and vigorously crank the motor of the fire engine, or drive it to the scene of the fire, or struggle with a kink in the hose, or vie with the intense heat and imminent dangers of the burning of such an inflammable and explosive solution as gasoline. It is not, however, to be supposed that unusually strenuous, vehement and energetic activities are necessarily to be confined solely to the precise exertions heretofore specifically recognized in our reported decisions.
We therefore zealously examine the transcript of the evidence in the present case, but with the consciousness that within the orbit of our review of the evidence we are not at liberty to ignore those inferences of fact which the deputy director and judge of the County Court could have logically and legitimately drawn from it. While it is the *228 legal and factual propriety of the judgment of the County Court with which we are directly concerned, and to the factual conclusions of which we accord determinative weight in the first instance, particular weight is given in this court to the findings of fact of the County Court when such findings agree with those of the deputy director in the Division of Workmen's Compensation. Gagliano v. Botany Worsted Mills, 13 N.J. Super. 1 (App. Div. 1951).
The locality of this fire at once aroused apprehensions of the possible devastations of its development and accordingly the six fire companies of the city were summoned. A "three alarm fire" is probably somewhat unusual. The fire evidently originated in the stock of merchandise stored in the cellar of the building. It was extinguished before it reached the second floor. It undoubtedly produced considerable smoke and some other fumes. The chief testified: "I would say that there were approximately twenty men affected by smoke and there were additional men affected by the fumes." Such, however, had occurred according to the chief "several times" during his term of service. He was asked: "And, during the time the firemen were there, did the firemen have to work pretty hard?" He answered: "The usual operation what a fireman would have at any fire." "It was a usual fire in that it involved household goods that were stored in the basement of this building." "And has Fireman Becker fought equally smoky fires at other times in the City?" "Yes." "Is that part of his usual work in fighting fires?" "Yes."
We turn to the testimony of the firemen of the decedent's company. Fireman Klemm, when asked, "Did you have to work easy, or did you have to work hard?" "Well, the way I worked at any other fire." The same question was addressed to Captain Schwartz, who replied: "The usual work. At the fire, we usually work all the same." To a similar inquiry fireman Schogger explained: "No, because we had double shifts practically. * * * You have then got eight or nine men instead of only four or five, whatever it might be, in the company." "Now, doing the things that fireman Becker did *229 at this fire is part of his usual work in fighting a fire, is it not?" "Yes, sir. It is regular routine of fighting a fire."
The performances of the decedent are the matters of superior interest and significance. He was on duty at the firehouse when the alarm was received. He assumed his station on the rear platform of the fire truck which was driven at a speed of "between twenty-five and thirty miles an hour" to the intersection of Bergenline Avenue and 36th Street where he "stepped" off and participated in connecting the hose to the hydrant from which it was extended to the engine in front of the Manhattan Building. He never entered the smoke-filled cellar but remained on the sidewalk and with assistance "fed" the hose back and forth as occasionally required through the cellarway to the firemen in charge of the nozzle.
In the concluding stages of the fire he and his associates drew the hose into Rodney's store where, according to the testimony of fireman Failla, "there wasn't what you would call too much smoke that you couldn't stand it." "The air was tolerable then." There were several firemen then available in the store who including the decedent worked "at ten minute intervals on the hose." It was while the decedent was in the store that Schogger asked the decedent "how he felt," and he replied "all right."
Orders came "to pick up" and return to quarters. Decedent walked out to the sidewalk and was standing in front of the building when he suddenly collapsed.
The chief defined the employment of the decedent in these words: "His usual duty would be to board the fire apparatus that carries hose and, upon arriving at the fire, to lay this hose at the scene, at the building, and then proceed to enter that building and extinguish or control the fire with least possible damage."
There may be some opportunity to infer that the final endeavor of the decedent was a brief participation in collecting the hose, but as to that exertion the chief was asked:
*230 "Do you know if he had ever rolled up a hose at other fires?" The answer: "To my knowledge, hundreds of times."
The salutary rule is well settled that if on our review the concordant findings of fact of the deputy director and of the County Court are not so clearly oppugnant to the evidence as to impair the interests of justice, they will not be supplanted. Vide, Kuperstein v. Gude & Cole Corp., 7 N.J. Super. 200 (App. Div. 1950).
"It is only when we are satisfied that the interests of justice require it, that we make independent findings of fact. Rule 3:81-13; cf. Rules 1:2-20 and 4:2-6." Gagliano v. Botany Worsted Mills, supra; Donofrio v. Haag Brothers, Inc., 10 N.J. Super. 258 (App. Div. 1950).
Applying the existing rules governing the statutory compensability in such cases to the adequately supported findings of fact, it seems apparent that the petitioner has failed to meet the requisite burden of proving a preponderant probability that the heart attack was caused by an unusual strain, exertion, uncommon event or happening, i.e., accident, arising out of the employment.
We conclude that the judgment of the Hudson County Court should be affirmed.