29 N.J. Super. 41 (1953)
101 A.2d 583
ANNE SNODEN, PETITIONER-RESPONDENT,
v.
BOROUGH OF WATCHUNG, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 24, 1953.
Decided December 11, 1953.
*44 Before Judges CLAPP, GOLDMANN and EWART.
Mr. Samuel P. Orlando argued the cause for respondent-appellant (Messrs. Orlando, Devine & Tomlin, attorneys).
Mr. John W. O'Brien argued the cause for petitioner-respondent (Messrs. O'Brien, Brett & O'Brien, attorneys).
The opinion of the court was delivered by GOLDMANN, J.A.D.
Appellant borough appeals from the whole of the final judgment entered in the Somerset County Court, Law Division, awarding death compensation to petitioner as the dependent widow of decedent, in her own behalf and in behalf of decedent's other dependents, his two minor children and his father. The Workmen's Compensation Division had previously also found in her favor.
The question on this appeal, as stated by appellant is: Did the death of petitioner's decedent result from an unusual strain or exertion arising out of and in the course of his employment by appellant as a volunteer fireman, so as to entitle her to an award under the Workmen's Compensation Act. The issue so phrased reflects the so-called "heart case" doctrine projected in Lohndorf v. Peper Bros. Paint Co., 134 N.J.L. 156 (Sup. Ct. 1946), affirmed 135 N.J.L. 352 (E. & A. 1947), and followed since by our highest tribunal, albeit by a divided court where the minority has not failed to express its view in a series of vigorous dissents. The cases are collected in Becker v. City of Union City, 17 N.J. Super. 217, 222 (App. Div. 1952). To these may be added the recent cases of Margolies v. Crawford Clothes, 24 N.J. Super. 598 (App. Div. 1953), and Seiler v. Robinson, 24 N.J. *45 Super. 559 (App. Div. 1953), affirmed by an equally divided court in 13 N.J. 307 (1953); cf. Pitkethly v. City of Paterson, 11 N.J. 331 (1953).
We are bound by precedent and must apply the principles established by the decisions. Those principles were succinctly stated by Judge Jayne in the Becker case (17 N.J. Super., at pages 222-224), and need not be quoted at length. We adopt his helpful review as a correct summary of the decisional law in its present state.
R.S. 34:15-7 requires that in order to establish a compensable injury by "accident" it must be shown that the alleged accident arose not only in the course of employment, but also out of the employment. The burden of proof is upon the claimant to establish these indispensable elements of her claim petition by a preponderance of the evidence. This may be accomplished by proof of a circumstantial character which preponderates in favor of the tendered hypothesis by supporting a rational inference founded upon a comparative superiority of probabilities according to the common experience of mankind. The claimant must, of course, show that the injury suffered was the proximate result of an accident within the express language of the statute. The proof is not required to eliminate all doubt; it is not a valid defense to show that death could possibly have been the result of natural causes. Probabilities, not possibilities, control the factual conclusion.
An accidental injury, to be compensable, need not be the result of traumatic force. However, an injury, though fatal, suffered in the course of employment but arising solely from natural causes wholly unrelated to an industrial mishap, is not compensable. One of the classes of bodily disabilities normally due to pathological causes is heart failure. Presumptively, heart failure results from natural physiological changes, and in such case our courts have placed upon the claimant the relatively increased burden of proving by a preponderance of the probabilities that the employment was a contributing factor to the disability, without which the alleged accident would not have happened. There has, *46 accordingly, been imported into the judicial exposition of our compensation law, the doctrine that in order to overcome the inference that a heart failure is due to natural causes, the claimant must produce "evidence of an unusual strain or exertion, event or happening incident to but beyond the mere regular employment itself," to establish satisfactory proof of an "accident" within the meaning of the Workmen's Compensation Act.
One of the tests applied by the heart cases is whether at the time of the mishap the employee was acting in pursuit of his customary and routine duty. As Judge Jayne observed, the logical efficiency of the "routine" duty test "must be somewhat discounted in cases involving those types of employment in which the adjective can be little more descriptive than a generalization, notably in its relevancy to the services of firemen and policemen whose occupations embrace the performance of an unpredictable variety of intermittent and contingent duties." Becker v. City of Union City, 17 N.J. Super. 217, 224.
We come, then, to the basic inquiry in this heart case of whether there was an unusual strain and whether, upon a consideration of all the evidence, the greater weight of the reasonable probabilities produces the conviction that there was a proximate and efficient causal relation between decedent's pursuit of his employment and the unexpected and undesigned attack resulting in his death. An accident, within the meaning of the statute, has been defined as an unlooked-for mishap or untoward event which is not expected or designed, an event happening at a specific time or occasion. Neylon v. Ford Motor Co., 8 N.J. 586, 588 (1952); Ptak v. General Electric Co., 13 N.J. Super. 294, 300 (Cty. Ct. 1951), affirmed 16 N.J. Super. 573 (App. Div. 1951).
Appellant conceded at the start of the hearing before the Workmen's Compensation Division that decedent, G. Edward Snoden, was "a volunteer fireman for the Borough of Watchung" and that the provisions of N.J.S.A. 34:15-75, fixing the basis of compensation of such fireman, applied. It may therefore be assumed that the borough inferentially *47 conceded that the provisions of N.J.S.A. 34:15-43 ("* * * each and every active volunteer fireman doing public fire duty * * * under the control or supervision of any commission, council or any other governing body of any municipality * * * who may be injured in the line of duty shall be compensated under and by virtue of the provisions" of the Workmen's Compensation Act  for a history of this provision, see Brower v. Franklin Tp., 119 N.J.L. 417, 422 et seq. (Sup. Ct. 1938)), also applied. Certainly at no time did the borough deny, nor does it now, that such was his status at the time of the happening of the incident which immediately preceded his death. It has, however, consistently maintained that petitioner's proof failed to overcome the presumption that her decedent's death from heart disease was the result of natural causes entirely unrelated to his employment as an active volunteer fireman.
We find no statutory provision which places such a fireman or his dependents in a more favored position than a paid fireman or any other employee, public or private, entitled to the benefits of the act. See McAnney v. Galloway Township, 120 N.J.L. 311, 313 (Sup. Ct. 1938). Accordingly, whatever decisional law has been developed prescribing the proof required to establish a right to compensation of dependents of a deceased employee, including paid firemen (cf. Becker v. City of Union City, 17 N.J. Super. 217 (App. Div. 1952), applies with equal force to the dependents of a deceased active volunteer fireman.
Decedent was 43 years old at the time of his death. He had been a member of the local volunteer fire company for 15 to 20 years, and for the past four years had operated a small gasoline station, assisted by a boy on weekends. The company had acquired a new fire truck a month and a half or so before the incident about to be mentioned, and Snoden was assigned to drive it. After the truck was delivered he became more active than before. He took the apparatus out on trial runs twice a week to show the other firemen how to use it, and was present on these occasions more often than any other men. These practice runs involved doing everything *48 one would at a regular fire. The new truck had been used in about 15 drills and had responded to perhaps one fire before March 6, 1950.
On that day Snoden left his gasoline station in charge of the boy and went home to change clothes preparatory to seeing his physician, Dr. Seybold. Petitioner testified there had been no change in her husband's health for some time, except that he complained of his back. Dr. Seybold had sent his patient to the Lahey Clinic, Boston, the preceding December for X-rays; the report was that Snoden had a moderate terminal type of arthritis of the back. The purpose of decedent's visit to the doctor that afternoon was to get the results of the X-rays.
Dr. Seybold had been treating Snoden since early 1946 for a rheumatic heart condition; the valves were involved and there was mitral stenosis with aortic regurgitation. The doctor saw him at least once a month, primarily for examination, and he checked his heart on the occasion of the latest visit. He found that Snoden's condition had not changed materially; there was the usual heart murmur, his blood pressure was about the same, and there were no symptoms of coronary insufficiency. Though the patient's basic heart condition had not changed, "symptomatically he was feeling much better and very much encouraged." The two spent some time talking over future plans to see if work less exacting than operating a gasoline station were possible. Dr. Seybold was unaware of his patient's volunteer fire work; such activity would not be indicated for one in Snoden's condition because of the bad effect that the excitement and effort of fighting fires would have on his heart. All in all, the doctor felt quite encouraged about his patient on March 6; he testified that with proper care and enough rest a man like Snoden could go on for a good many years, "even to a ripe old age." Had Snoden's condition been progressive Dr. Seybold would ordinarily have expected some predisposing factors to be indicated when he examined him only a little more than an hour before he died, but the doctor found none.
*49 Snoden left the doctor's office at 4:20 P.M. and went to a drug store to purchase ice cream. While there the fire alarm rang. He immediately left the place and drove his automobile to the fire house. McGwire, a junior member of the company, testified Snoden drove up at about 4:30 P.M. and stopped ten feet from the engine. "He was moving at a pretty good clip, he was in a hurry. * * * I would say he was trotting. * * * He jumped up on the other side of the driver's seat * * * [a]nd we took off." Lieutenant Orton, under whom Snoden served, jumped on the truck, and he, McGwire and another fireman, with Snoden driving, went off to the fire some three miles away at a speed of 50 to 55 miles an hour. Traffic was normal and no difficulty was experienced as the fire truck sped along in the fast lane, siren blowing.
The truck proceeded from the fire house along Somerset Street for a mile and then slowed down and turned left on Route 29, two miles from the fire. At that point the men could see a cloud of black smoke in the distance. It looked like a large fire, so Orton, McGwire and Snoden planned the manner in which they would connect to a hydrant. However, when the engine was about 150 feet from the fire they saw that only a small, one-story structure was involved, and that the fire could be controlled by using the booster hose running from the truck tank. Snoden stopped the truck about 30 feet from the burning structure. Orton and McGwire had jumped off an instant before and each began to pull a booster hose toward the fire. Snoden's task at that moment was to remain in charge of the truck and engage the booster pump so as to provide water to the hoses. To do this he had to disengage the motor from the driving mechanism and engage the pumping mechanism, then step down to the operating board on the side of the truck and, by manipulating the pumping levers, get a supply of water into the hoses from the pump. He apparently tried to do this, as he had so often successfully done on the trial runs. Ordinarily, a stream would be produced in short order  McGwire testified to less than a minute or as much as two *50 minutes; Orton said it took about two minutes to get water on a fire but "[i]t could be done quicker." Snoden's efforts failed on this occasion; he could deliver no water.
There is no testimony as to just what Snoden did or what happened from the time the others jumped off the truck and ran toward the fire until Orton returned to see what was the matter. He found Snoden trying to operate the pumping levers at the side of the truck, and observed that he was "having trouble with the apparatus." Orton noticed the engine had stalled; he did not recall that ever happening before. Snoden climbed back on the truck to restart the engine and called to Orton to operate the levers. He then climbed down and water started flowing through the hose. According to Orton, it had taken more than five minutes to get water; this was the first time such a thing had happened. McGwire fixed the time at from five to ten minutes.
Orton returned to the fire and never again saw Snoden alive; as for McGwire, he did not see decedent from the time he arrived at the fire until he viewed the body at the funeral. What happened was that after Orton returned to the blaze, Snoden went to the rear of the truck, asked a policeman to get a doctor, collapsed and died. Neither Orton nor McGwire had noticed anything wrong with Snoden on the way to the fire.
The rule that petitioner, in order to overcome the inference that a heart failure is due to natural causes, must produce evidence of "an unusual strain or exertion, event or happening incident to but beyond the mere regular employment," does not require that the strain be physical or laborious in character. Unusual emotional or nervous strain and anxiety may be sufficient to satisfy the rule. See Van Ness v. Borough of North Haledon, 136 N.J.L. 623 (E. & A. 1948). An unusual event or happening may be adequate to meet the requirement.
We must not be insensible to what happened here or to the man who was directly involved. Snoden had for years engaged in volunteer fire activities. He apparently was so *51 interested in continuing in the work that he never made this fact known to Dr. Seybold who was treating him for his heart condition and had enjoined him to desist from all work that could possibly affect that condition. All excitement and physical effort were proscribed. The arrival of the new engine, with Snoden assigned as the one person who was to drive and be in complete charge of it at fires, spurred him to greater activity than ever before. It was his truck, and he put it and his fellow firemen through numerous drills to insure as perfect performance as possible when there actually was a fire. The results were seemingly good; he could get water on a blaze within one to two minutes. Then came the fire of March 6. We have the sequence already unfolded: the sudden fire alarm, the hurried departure from the drug store, the quick drive to the fire house, the rush to get on the fire truck, the 50- to 55-mile-an-hour run to the blaze, the first impression of what seemed a large fire, the change of plan when the blaze turned out to be a small one, the failure to get water to the hoses in the usual quick order. Snoden, alone at the truck, is in trouble; he cannot get water to the three who are waiting with hoses near the burning structure. He works at the pumping levers while one, two, and then three minutes pass. The company lieutenant has to run back to the apparatus to determine the cause of the failure. Snoden gets on the truck, starts the motor up again, descends, and finally, after more than five minutes, manages to get water to the dry hoses.
The effect upon one like Snoden, charged with responsibility for providing water from the pump, cannot be doubted. A delay of over three minutes  and if we accept McGwire's testimony of a stream produced in from five to ten minutes, then even longer than that  beyond the usual time for supplying water, would not only be an unusual event or happening, but also a source of unusual emotional or nervous strain and anxiety. That the event or happening was unusual and beyond the course of regular employment is clear from Lieutenant Orton's testimony, for he could not recall such an event ever happening before March 6. It was most *52 certainly incident to the regular employment. And it is significant that the heart seizure and death followed within an instant of this unusual event or happening and the incidental unusual emotional or nervous strain.
We agree with the deputy director and the County Court judge that the proofs establish Snoden suffered an accident within the meaning of R.S. 34:15-7, and that his death occurred in the course of his employment by the borough as a volunteer fireman. Similarly, we are in accord that his death arose out of that employment.
No autopsy was performed. It was Dr. Seybold's opinion, as noted on the death certificate, that death resulted from a coronary occlusion, although he stated that it could have been just an acute failure of the heart. Much of his testimony has already been summarized and need not be repeated. He stated that there was a very definite relation between the unusual strain and excitement resulting from the incidents related above and the death. The County Court judge found his testimony impressive; so had the deputy director in the Division who observed that this was so not only because great weight should be assigned to the testimony of the treating physician, but also because of his demeanor on the stand and the fact that the doctor had examined Snoden shortly before the accident and found no indication of cardiac embarrassment.
Both also found the corroborative testimony of petitioner's expert witness, Dr. Olcott, equally persuasive. A specialist in pathology and diagnosis whose qualifications were readily admitted, he, too, testified to a very definite causal relation between the related incidents and the death. Heart failure  he preferred to use this more general term to describe a situation where the heart causes death and only an autopsy would show whether there was an occlusion  "directly attributable to the events and the emotion of the day [was] the precipitating factor that made the heart muscle succumb."
The two medical experts produced by the borough found no causal relation between decedent's immediately preceding activities and his death. In their opinion, death resulted *53 from a natural development of the pathologic condition of the heart. Emotional disturbance, excitement and physical activity, they said, play no part in coronary occlusion (but see Breheny v. Essex County, 132 N.J.L. 584, 588 (Sup. Ct. 1945), affirmed 134 N.J.L. 129 (E. & A. 1946); Amend v. Amend, 12 N.J. Super. 425, 442 (Cty. Ct. 1950)), yet rest is an important element in the treatment of any heart case. Both asserted that the unusual strain and excitement and the cardiac collapse in this case were purely coincidental. We agree with the tribunals below in characterizing such testimony as straining credulity. Cf. Weisenbach v. Borough of New Milford, 134 N.J.L. 506, 509 (Sup. Ct. 1946), where Justice Heher said of the medical specialists' testimony adduced by the municipality:
"Their testimony is not convincing. It is at odds with the strongly preponderant scientific view; and it would seem to be at odds with common experience. Fire service has its hazards for one with a cardiac deficiency. Mere coincidence is not a permissible deduction in the face of evidence which, according to the teachings of long experience, demonstrates a causal relationship. It is a concept that vanishes in the light of a reasonably probable explanation contra that excludes pure conjecture; such is the principle that guides one's judgment in the everyday affairs of life."
The general sequence of events, in point of time, is much too significant, as the deputy director observed, to classify Snoden's activities at the time of his collapse as coincidental. The proofs forcibly project the conclusion that decedent's collapse and death would not have taken place at the time they did but for the unusual strain, exertion and emotional tension and excitement to which he had been subjected.
Our review of the record leads us to the same conclusion as was reached by the Division of Workmen's Compensation and the County Court. There is no reason or need to make new and independent findings of fact. Giresi v. E.I. duPont de Nemours & Co., Inc., 7 N.J. Super. 41 (App. Div. 1950); Gagliano v. Botany Worsted Mills, Inc., 13 N.J. Super. 1 (App. Div. 1951). Petitioner amply carried out her burden of proving by a preponderance of the credible evidence that her husband's death resulted from an accident *54 which arose out of and in the course of his employment by appellant as a volunteer fireman.
Affirmed.
EWART, J.A.D. (dissenting).
My view of the facts of this case and of the applicable law compels me to express my dissent from the majority opinion.
The facts as disclosed by the record are substantially as set forth in the majority opinion with the following modifications: Decedent's regular job with the volunteer fire company was to drive the fire truck from the fire house to the scene of the fire and that he did on March 6, 1950, the day of his death, and under the supervision of his superior, Lieutenant Orton, he was in charge of the fire engine and its operation. When the engine arrived at the scene of the fire it was apparent to the men that the fire was a small one which could be controlled by using the booster hose running from a tank on the truck. Lieutenant Orton and Fireman McGwire carried the hose from the truck to the scene of the fire, and it was decedent's job to shift the gears in the truck so as to engage the pumping mechanism and then to climb down from the driver's seat and shift certain levers on the side of the truck which permitted the water from the tank to flow through the hose. Lieutenant Orton testified that there was a two- or three-minute delay in getting the water into the hose and he went back from the scene of the fire to the fire engine to ascertain the cause of the delay; he noticed that the truck motor had stalled so that the pumping mechanism was not working; decedent then climbed back to the driver's seat on the truck and started the motor (presumably by pressing the starter button) while Lieutenant Orton remained at the side of the truck to operate the levers; the water commenced to flow through the hose and Lieutenant Orton went back to the scene of the fire while the decedent climbed down from the driver's seat in the truck. Lieutenant Orton testified that, all told, there was perhaps a five-minute delay in getting the water from the hose onto the fire.
*55 The majority opinion speaks of decedent having hurried to the fire house on the sounding of the alarm, and having trotted to the fire truck upon which he climbed. Inasmuch as he stopped his car within ten feet of the fire truck, he didn't have far to trot. About three steps should have covered the intervening distance.
In support of her claim, petitioner called Doctor Arthur D. Seybold who had been decedent's family physician for a period of some four years, from early 1946 until the day of decedent's death on March 6, 1950. The doctor testified that decedent was suffering, during this period of four years, with a serious heart lesion, a rheumatic heart disease  that decedent had mitral stenosis with aortic regurgitation which, altogether, is a rheumatic valvular heart condition; that he had been prescribing digitalis for the decedent because the heart muscles as well as the heart valves were involved; that he saw and treated the decedent over the four-year period on an average of once a month, sometimes more often, and checked his heart on the very day of decedent's death; that he had talked with the decedent for some time about getting work less exacting than the operation of a gasoline station which was the decedent's regular occupation; that he hadn't the remotest idea that the decedent was a volunteer fireman and, in response to a question as to whether such occupation as a volunteer fireman would be indicated for a man in decedent's condition, the doctor answered "Positively no," because work as a fireman involves both excitement and physical effort which was not good for the type of heart condition from which the decedent suffered. As to the cause of the decedent's death, the doctor, on direct examination, made the following significant statement:
"The physical strain of driving the truck, aggravated by the attendant excitement that goes with a fire, I feel was just too much for his heart to take."
The doctor further testified on cross-examination that no autopsy had been performed; that death could have been caused by a stroke or an acute heart failure or a coronary *56 occlusion as he set forth on the death certificate, or by any one of those things. And the doctor further testified that during the four-year period he treated the decedent for the heart condition, he had recommended rest, had limited decedent's activities, had him give up some of his strenuous activities such as driving a tractor, plowing snow out of a driveway, plowing the fields, changing tires in the gasoline station, etc., and had, in fact, limited decedent's activities in every way possible. And the doctor expressed the opinion that the decedent could have suffered a coronary occlusion, which is shown as the cause of death on the death certificate, even while at rest.
The majority opinion states:
"We come, then, to the basic inquiry in this heart case of whether there was an unusual strain and whether, upon a consideration of all the evidence, the greater weight of the reasonable probabilities produces the conviction that there was a proximate and efficient causal relation between decedent's pursuit of his employment and the unexpected and undesigned attack resulting in his death."
I cannot subscribe to the correctness of the foregoing statement. I have no doubt that there was a proximate and efficient causal relation between decedent's pursuit of his employment and the heart attack which resulted in his death. A man suffering from a serious heart condition as was the decedent, for whom rest had been prescribed and whose doctor had recommended that he give up all strenuous activities, should not have engaged in work as a volunteer fireman. The physical strain of driving a fire truck, aggravated by the attendant excitement that goes with a fire, was just too much for his heart to take, but such acts were the normal routine of decedent's activities as a volunteer fireman. They might be expected to produce death even without the occurrence of an accident and without the decedent having been subjected to any unusual strain or exertion or excitement.
If the above statement quoted from the majority opinion be correct, then an award of compensation should have been *57 made in the following cases: Ames v. Sheffield Farms Co., 137 N.J.L. 336 (Sup. Ct. 1948), affirmed 1 N.J. 11 (1948); Grassgreen v. Ridgeley Sportswear Mfg. Co., 2 N.J. Super. 62 (App. Div. 1949); Temple v. Storch Trucking Co., 2 N.J. Super. 146 (App. Div. 1949); Seiken v. Todd Dry Dock, Inc., 2 N.J. 469 (1949); Becker v. Union City, 17 N.J. Super. 217 (App. Div. 1952); Seiler v. Robinson, 24 N.J. Super. 559 (App. Div. 1953); Pitkethly v. City of Paterson, 12 N.J. 564 (1953). All of these cases were "heart" cases in which compensation was denied, although in each case there was a proximate and efficient causal relation between decedent's pursuit of his employment and the unexpected and undesigned heart attack which resulted in injury or death. But in each of those cases, it was found that the evidence was insufficient to overcome the presumption that the heart attack was the consequence of disease, that is, natural causes, or that it was caused by an unusual strain or exertion not a part of the usual routine of the employee's occupation.
In the case at bar it is quite apparent and is undisputed that decedent was suffering from a heart condition which made it highly inadvisable for him to engage in activities as a volunteer fireman.
I think the record in this case is devoid of proof to support the conclusion that decedent suffered an "accident" within the meaning of the statute and the pronouncements of our courts which would entitle his dependents to compensation in this case. Nor can an award be justified on the basis of a social philosophy which would award compensation in any case where the employee suffers a heart attack while engaged in the normal activities incident to his occupation. To do so would constitute the employer an insurer of the health and life of the employee, which is not contemplated by the statute. Nor should the courts by construction extend the terms of the statute to cover such a case and thus usurp the function of the Legislature.