46 N.J. Super. 475 (1957)
135 A.2d 14
WASIL ABELIT, PETITIONER-RESPONDENT,
v.
GENERAL MOTORS CORPORATION, RESPONDENT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 30, 1957.
Decided October 4, 1957.
*476 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Carl S. Kuebler argued the cause for appellant (Messrs. Carpenter, Bennett, Beggans & Morrissey, attorneys).
Mr. Mortimer Wald argued the cause for respondent (Messrs. Wiener, Wiener & Glennon, attorneys).
PER CURIAM.
Respondent appeals from an award by the deputy director in the Workmen's Compensation Division of 20% of total permanent disability, affirmed by the County Court. The sole basis for appeal is factual, respondent contending that the weight of the medical testimony clearly proves that petitioner's disability was in no way related to his employment.
The instant claim is one for an occupational condition rather than a sudden trauma or accident. Petitioner suffers from a winging of the right scapula; when he raises his arm beyond a certain point the shoulder blade protrudes from the back, making it impossible for him to elevate his arm without extreme pain. He claims that this condition was caused by the nature of the repetitive movements required in performing his job on defendant's assembly line.
Plaintiff began working for defendant in 1953, and early in 1955 was transferred to the assembly line job. Before that time he had never had an accident or serious illness; *477 there is no history of prior complaints. Petitioner's new job was to drill holes in the floors of cars for sill plates which were to be screwed thereto in a subsequent operation. He worked only on the right side of the cars, which passed his station at the rate of about one a minute. The procedure followed was as follows: He would take the sill stock from a rack some five feet away; occasionally he had to go a greater distance for it. He then pressed a foot pedal which would put sealer on the bottom of the sill. The next step was to put the sill plate in place on the car, about 12 inches from the ground. While holding the plate with his left hand, and while his body was bent over in about a 90-degree position, he would reach up with his right hand for a quarter-inch electric drill, weighing five to seven pounds. The drill was about on a level with his head but was in a holster, necessitating an upward lift of the right arm to get it out. After pulling the drill out of the holster he would bring his arm down to the forward position for the drilling operation. Holes were already bored in the sill plate, and what petitioner did was to drill through them downward into the floor of the car to a depth of 1/32". The car continued to move during the operation. Petitioner testified that the drill vibrated and he could feel the vibration all over his body.
Petitioner demonstrated this movement several times before the deputy director, who described the movement as involving a "rolling, twisting motion" of the right shoulder.
On March 8, 1956 petitioner went to the plant hospital complaining of a cold, and was given pills. He was also treated by his personal physician, who gave him a shot of penicillin. The cold lasted four or five days. On April 5, 1956 petitioner went to the plant hospital complaining of pain in his right shoulder. This had been preceded some two weeks before by what petitioner described as a numb, "funny" feeling in that area. He received treatment and subsequently, on April 17, went to see his family physician, Dr. Chodosh, who continued to treat him for two months and then sent him to Dr. Wiesenfeld, an orthopedic specialist. *478 Dr. Wiesenfeld undertook a long series of treatments. Petitioner had to leave his job in April 1956, and at the time of the hearing had not yet returned to it.
It is admitted by all the doctors who testified that petitioner's winged scapula prevents him from raising his arm to full elevation without pain.
Dr. Wiesenfeld testified that his present opinion was that petitioner's condition was caused by minimal but repeated trauma to the long thoracic nerve, these trauma being due to the movements necessitated by petitioner's work. The nerve injury, in turn, caused a paralysis of the serratus anterior muscle served by the nerve and holding the scapula in place. Although he admitted that he did not come to this conclusion originally, he stated that his treatment of petitioner over a long period of time gradually eliminated the possibility of other causes, such as infection, virus, penicillin allergy or polio. He concluded petitioner had paralysis of the long anterior thoracic nerve, and that it was a well-known fact that this type of injury results from trauma in a majority of cases. He traced the course of the nerve, showing its lack of protection in certain places.
On cross-examination Dr. Wiesenfeld emphasized what he had said on direct  that treatment had improved the range and power of petitioner's shoulder muscles, but not those which moved the scapula. This, in his opinion, substantially ruled out the possibility of other causes. He also said that the possibility of infection as an initiating cause was ruled out because of the lack of involvement of nerves other than the long thoracic nerve. He completely disagreed with the theory that it would take a severe trauma to cause an injury to the nerve. On re-direct examination he iterated that his opinion was based on the probabilities, and these preponderated in favor of the view that petitioner's condition resulted from the type of work he was doing.
Respondent's medical experts agreed with Dr. Wiesenfeld that petitioner's condition was caused by a lesion of the long thoracic nerve and consequent paralysis of the serratus anterior muscle. However, they differed from him in that *479 they concluded that this lesion was not caused by or in any way connected with the employment, but was the result of a virus or some other infection of the nerve. Polio as a cause was pretty much ruled out. Dr. Stookie, respondent's chief expert, who had examined petitioner for about three minutes on the day of the hearing, seemed to rely chiefly on the fact that his examination revealed involvement of the right biceps. He was of the opinion that the trauma which petitioner claimed was the cause of this condition would not have produced any weakness or atrophy in the biceps. In his view, the pain of which petitioner complained was a further indication that the winged scapula did not result from his work; weakness and not pain is a symptom of that condition. Trauma, he said, is rarely a cause of serratus anterior muscle paralysis. In his opinion, trauma could bring on a winging of the scapula only if severe; he had seen it occur in the case of a plasterer who works all day with his arm overhead, or a man who carries a heavy, sharp object, such as lumber, on his shoulder repeatedly.
The other two doctors for respondent testified substantially the same as Dr. Stookie.
After carefully reviewing all the medical opinions, and the various hypotheses presented in the course of the testimony, the deputy director specifically found that "the only acceptable probability" was that there was a pinching of the thoracic nerve each time petitioner made a rolling motion with his shoulder, and that "this constant and repetitive trauma in each instance constituted an untoward event, such as to constitute an accident." The finding of the County Court was substantially similar. After reviewing the evidence at some length, it concluded that "a more probable explanation of the petitioner's condition is that his injury was caused by constant and repetitive nerve trauma," and that petitioner had fully sustained his claim. (At the time of this determination the deputy director's findings of fact had not yet been made available to the County Court, so that its findings were truly independent and the result of bringing a fresh mind to the record.)
*480 The Workmen's Compensation Division and the County Court considered the facts and particularly the conflicting medical testimony. Their findings clearly show that they accepted the theory of Dr. Wiesenfeld, the treating physician, which theory was based on his conclusion that the probabilities preponderate in favor of the hypothesis that petitioner's condition was caused by his employment. In the face of these concurrent findings, we will not make a new and independent finding unless the error in the concurrent findings is so palpable that a new finding by us is necessary to insure essential justice. Pfahler v. Eclipse Pioneer Division, etc., 21 N.J. 486, 492 (1956).
The findings of the lower tribunals are clearly supportable by the evidence. Petitioner was not bound to eliminate all doubt and demonstrate beyond peradvanture that his condition was caused by his employment. All that was required of him was to show by a preponderance of the credible evidence that his tendered hypothesis of the cause of his condition was a probable or more probable hypothesis with reference to the possibility of other hypotheses. Gilbert v. Gilbert Machine Works, Inc., 122 N.J.L. 533, 538 (Sup. Ct. 1939). A claimant's burden of proving the essential and indispensable elements of his claim by a preponderance of the evidence is discharged by proof "which preponderates in favor of the tendered hypothesis by supporting a rational inference founded upon a comparative superiority of probabilities according to the common experience of mankind." Becker v. City of Union City, 17 N.J. Super. 217, 223 (App. Div. 1952); Trusky v. Ford Motor Co., 19 N.J. Super. 100, 102-103 (App. Div. 1952).
Petitioner had one other medical expert, Dr. Spinner. The lower tribunals disregarded, or at least laid no stress on, his testimony. This they were entitled to do, especially in view of the fact that his testimony differed from that of all the other doctors. Their reliance upon the testimony of Dr. Wiesenfeld was clearly justifiable. Where medical testimony is in conflict, greater weight ordinarily will be accorded to the testimony of the treating physician. Bialko *481 v. H. Baker Milk Co., 38 N.J. Super. 169, 171 (App. Div. 1955), certification denied 20 N.J. 535 (1956).
The fact that it may be quite unusual for petitioner's condition to be found in industry, or that petitioner was unusually susceptible to that particular condition, does not necessarily detract from its relationship to the employment and its compensability. Stepnowski v. Specific Pharmaceuticals, Inc., 18 N.J. Super. 495 (App. Div. 1952) (effemination due to exposure to certain hormones); Bondar v. Simmons Co., 23 N.J. Super. 109 (App. Div. 1952), affirmed 12 N.J. 361 (1953) (bursitis in right shoulder from pushing a lever 500 to 700 times a day); Duncan v. T.I. McCormack Trucking Co., 43 N.J. Super 352 (App. Div. 1956) (Dupuytrens Contracture from repeated driving of heavy equipment and handling of heavy apparatus); Walsh v. Kotler, 46 N.J. Super. 206 (App. Div. 1957) (Dupuytrens Contracture from repeated pulling of ropes to hoist material).
We conclude that the concurrent findings below are not so palpably erroneous as to require us to make a new and independent finding to insure essential justice.
Affirmed.