45 N.J. Super. 283 (1957)
132 A.2d 337
ROBERT GIBSON, PETITIONER-APPELLANT,
v.
TODD SHIPYARD CORP., RESPONDENT-APPELLEE.
Superior Court of New Jersey, Hudson County Court.
Decided June 1, 1957.
*284 Mr. Noah Lichtenberg, attorney for petitioner-appellant (Mr. Mortimer Wald, of counsel with petitioner-appellant).
Messrs. Skeffington, Haskins & Skeffington (Mr. James J. Skeffington, appearing), attorneys for respondent-appellee.
DREWEN, J.C.C.
This is an appeal from the dismissal of a claim petition for workmen's compensation. Petitioner has been in respondent's employ as a pipefitter and coopersmith at intervals since March 13, 1946. He was continuously so employed from June 1953 until in or about December 1955. Prior to the latter period and during his said employment he had been hospitalized on several occasions for abdominal surgery. These operations, save for the latest one of them, have no bearing on the present issue. The one operation with which we are concerned occurred December 3, 1952, when petitioner underwent surgery for duodenal ulcer. The present claim is for a herniation through the incision resulting from that surgery. Respondent makes no claim that there is or was any surgical defect.
The petition as originally filed sought an award in the alternative for accident or occupational disease. The proofs did not materialize to sustain a claim of accident and the case on appeal is for hernia as an occupational disease under the statute (N.J.S.A. 34:15-31). The date when occupational disease ensued is charged as November 17, 1955. On that date petitioner underwent a periodical examination by *285 the plant doctor as the result of which the doctor certified that petitioner was suffering from a ventral hernia that called for "corrective measures." Thereupon petitioner consulted Dr. Visconti, who was petitioner's medical expert in the hearing. It should be made clear that prior to the plant examination on November 17, 1955 petitioner had periodically undergone similar examinations, with no positive finding therefrom except for the prior operational scars. Following the examination of November 17, 1955 petitioner continued to be employed by respondent and is so employed at the present time. After the operation for duodenal ulcer, performed as stated on December 3, 1952, petitioner returned to work. The date of his return was March 30, 1953, and it is during the aforementioned period from June 1953 until in or about December 1955 that the hernial condition complained of is alleged to have had its inception and development, as a result of the extreme bodily rigor of petitioner's work in respondent's plant.
The testimony is replete with detailed description of constantly recurring daily episodes in petitioner's employment requiring the expenditure by him of extreme muscular strain and effort. No purpose would be served by repeating the details of that testimony here. The medical experts are one in admitting the potential competency of petitioner's work as a causal factor in the inception and growth of his hernia. Just wherein the doctors differ will presently appear.
Dr. Visconti made his first examination of petitioner on December 22, 1955. He reports his findings as follows: "In the abdominal region there was noted a long nine-inch operative scar in the left upper abdominal quadrant"; also "a bulging of three inches by three inches in the middle portion of the operative scar. This increases with coughing and there is discomfort on flexing the thighs upon the abdomen." These findings by Dr. Visconti are generally in keeping with those later made by Dr. Watman for respondent.
The issue here is entirely that of causality. The diverse propositions to be dealt with are the tendered hypothesis *286 of the industrial cause, that is the arduous and laborious employment; and the alternative causal hypothesis of designated commonplace, everyday incidental things like sneezing, coughing, straining at stool and the like. Both physicians admit also the potential causative competency of the latter functionings. Dr. Visconti, in the face of the dominant proof of constant and extraordinary industrial effort, excludes these functionings from the causal hypothesis. Dr. Watman does not exclude them from the causal hypothesis, and each of the two experts gives his reasons. I deem it in order that in this connection both physicians be quoted at length.
Dr. Visconti testified as follows:
"Q. What is your opinion, Doctor? A. It is my opinion that the type of work and the work that this individual did was the causative factor in producing the ventral hernia at the situs of the operation of 1953.
It is based upon the following main considerations: number one, there had been an increase in intraabdominal pressure sufficient to produce the hernia in the form that it has become manifested; that the individual being, at tops, 212 pounds, ordinarily would be entitled to lift one-fourth his body weight which would be 53 pounds, if he were a normal individual; that is one of the standing rules; however, this man certainly exceeded that weight by a considerable margin and the type of work that he did, the pushing, pulling, all sum up to increase in abdominal pressure over a period of time sufficient to be the causative factor in producing this incisional or ventral hernia."
As to petitioner's freedom from pain throughout the course of the hernial inception and development, which is a significant element in the controversy, Dr. Visconti testified:
"Q. And, need there be any conscious pain associated while this process is going on? A. It may vary from pain, slight discomfort, to no pain at all, depending upon the gradual process in which it is formed and the accommodation that goes from time to time; there is a sudden rupture, sudden bulging or sudden tear; one would be able to accept pain but the lump is insidious over a long period of time and one may not have any pain or may have slight discomfort."
*287 And again:
"Q. Why did you say with such certainty that it is probable that this man's occupation is the cause of the incisional hernia that you found on examination and say that it is only possible that this incident could have caused it? A. You will note that when the man testified, he was different than the ordinary individual; he said he had no pain; if he had a real episode in 1955, a sudden increase in abdominal pressure and a sudden rupturing, it certainly would have been reported as such and he would have pain; this man said he doesn't have pain and I heard him testify and the hypothetical question so states. So, if anything, this comes on gradually and insidiously and over a long period of time, not the result of one incident. This is my opinion.
Q. Doctor, wouldn't you expect if the petitioner did laborious work as described to you in the hypothetical question, he would have had, off and on, some pain or some discomfort in his abdominal area if this work were producing, as you say, slowly and insidiously, this ventral hernia that you found on examination? A. I think I have already answered that. This comes on gradually and insidiously and he accommodated himself to the various increase in the abdominal pressure. As far as pain is concerned, it varies with all individuals; one person may have a mild discomfort which may be negligible and another slight pain and they may feel it intensely; it depends on the individual and the type of threshold for pain the individual has.
Q. But, Doctor, this petitioner has testified, `I felt no pain during the entire period of time that I was working. I felt no pain or discomfort at the time of this annual physical examination. I am still doing the same work. I still feel no pain today on the witness stand. I have no pain or discomfort.' Does that type of statement on the part of the petitioner bespeak to you a hernia which developed on account of the occupation he was engaged in with the respondent? A. It certainly does. If ever there was one that spelled out an occupational condition due to the gradual increase in the abdominal pressure exerted, this one does, in my opinion."
Dr. Watman, per contra, testified:
"Q. What relationship, Doctor, does this incisional hernia bear to the employment of the petitioner by the respondent in the manner as described in Mr. Wald's hypothetical question propounded to Dr. Visconti? A. I do not think that there is any relationship of the incisional hernia to his employment. In the question that I heard, apparently this man has been a pipe fitter for many, many years and in the question there have been descriptions of all kinds of endeavors with all kinds of incidents under which he worked and nowhere in the entire question do I find an incident of a sudden stress or strain nor of a direct trauma which could competently *288 produce this incisional hernia. If any one of these things, these efforts, that are described in the hypothetical question were to be the cause of this incisional hernia, certainly the individual would recognize that fact and report that fact and would have not only subjective but objective evidence of the incisional hernia to prove the fact that the incisional hernia was the result of an incident in question.
In the question there is brought out that he lifted heavy weights; true; any one of those  lifting heavy weights  could produce an incisional hernia and the question has been brought out he may be in an awkward position; true; going about in an awkward position could produce an incisional hernia. The placing of one pipe onto another  what do they call it  the placing of the flange which entails heavy lifting; that could cause an incisional hernia; climbing up eight feet in order to get a pipe, or some pipes, that could cause an incisional hernia; but if any one of those things caused it, the man would be cognizant of it and if this is to be considered an occupational thing, he would be cognizant of the fact that this scar has become weaker and weaker from day to day or from week to week and is becoming more and more prominent and if he doesn't notice it from day to day or week to week or month to month, then the only way you could get it would be by a sudden stress or strain or a direct trauma which would produce this sudden rupture of the muscles and sudden development of pain and the appearance of a swelling which would be diagnosed by any doctor as an incisional hernia and not only that but this condition could come on progressively, even if he were not working; it could develop in the course of time merely from coughing, it could come from sneezing, from lifting ordinary objects in his home, chairs, tables, helping to push a table or carry some goods from the Chain Store; it would be a gradual condition and it would not necessarily have to come from his occupation as a pipe fitter."
Petitioner himself testified that he had noticed the lump for an indefinite time prior to the plant examination of November 17, 1955; that he had paid no attention to it, not realizing its nature or cause; and that he had thought it was the result of overeating and excessive weight. He did not have the lump immediately following the operation and did not think he had had it for a year thereafter. He is unable to tell exactly how long it had been present prior to the plant examination referred to; and at no time had the condition caused him pain.
It is my judgment that the tendered hypothesis of industrial cause must be accepted, and for several reasons. *289 To begin with, on the non-industrial side we have grounds of causation that are casual, more or less random, and suppositions as well. They are not the subject of specific proof in the case. The only subject of such proof is the other aspect of the problem, that relating to industrial effort, which is shown to be a definite, identified and all-sufficing, egregious, positive thing. It is the one instant, exigent body of proof in the case on this subject and so, I think, must be held to preponderate. Secondly, were there to be final approval of the result thus far had in the case, it must follow therefrom that our law of workmen's compensation is incapable of dealing with a condition like that sub judice  assuming its status to be that of a disease under the statute  since in the nature of things, as the doctors indicate, it can be caused not only by the workman's major, laborious effort but also by more or less slight and casual everyday things as already indicated. Under the circumstances, the mere supposition of the latter would be permitted to annul the clear and manifest probabilities in the proof of the former. In a word, there would ensue a kind of inevitable and indiscriminate obstacle to the making of an award in any case of the kind, be the claim itself ever so valid in fact. Thirdly, the connotations of Dr. Watman's statement make the presence or absence of pain in petitioner important to the logic of the doctor's conclusions. But in all that Dr. Watman says, he makes no allowance for the difference between one patient and another in the realm of pain phenomena, a difference upon which Dr. Visconti so positively pronounces, the significant thing being that Dr. Watman does not deny that such personal differences do exist and that they are genuine and real in medical experience. Lastly, bodily exertion, whether excessive or slight, is, according to both doctors, the causal factor here. From this it follows that the industrial cause must be the more probable one for the reason that it must be regarded as more drastic and thus more efficacious. Comparison of petitioner's laborious work with the lighter possibilities that are submitted by respondent ex hypothesi removes *290 all doubt, in my judgment, as to where the preponderant probability lies.
The requirement of the decisions is proof of a probable or more probable hypothesis with reference to the possibility of other hypotheses. Ames v. Sheffield Farms Co., infra; Gilbert v. Gilbert Machine Works, Inc., 122 N.J.L. 533 (Sup. Ct. 1939). In Becker v. City of Union City, 17 N.J. Super. 217, 223 (App. Div. 1952), it was held:
"The proof, however, is not required to eliminate all doubt. Ames v. Sheffield Farms Co., 1 N.J. 11 (1948). It is not a valid defense to show that the death [injury] could possibly have occurred from natural causes. Probabilities, not possibilities, must control the factual conclusion. Sunkimat v. Senger Coal & Ice Corp., 137 N.J.L. 103 (Sup. Ct. 1948)."
See also Trusky v. Ford Motor Co., 19 N.J. Super. 100 (App. Div. 1952).
Moreover, the employment need not be the sole cause of the injury; the proof is adequate where it shows the employment to have been a contributing cause. Schust v. Wright Aeronautical Corp., 7 N.J. Super. 54 (App. Div. 1950), certiorari denied, 5 N.J. 177 (1950); Furferi v. Pennsylvania R. Co., 117 N.J.L. 508 (E. & A. 1936); Cavanaugh v. Murphy Varnish Co., 130 N.J.L. 107 (Sup. Ct. 1943), affirmed 131 N.J.L. 163 (E. & A. 1943).
The next question is whether petitioner's disorder is a disease within the meaning of N.J.S.A. 34:15-31. The statute reads:
"For the purposes of this article, the phrase `compensable occupational disease' shall include all diseases arising out of and in the course of employment, which are due to causes and conditions which are or were characteristic of or peculiar to a particular trade, occupation, process or employment, or which diseases are due to the exposure of any employee to a cause thereof arising out of and in the course of his employment." As amended: L. 1945, c. 53, p. 318, § 1; L. 1949, c. 29, p. 103, § 2.
One difficulty had with this question in the Bureau seems to have been a certain preoccupation with the idea that *291 controlling significance attaches to whether the condition for which compensation is sought is a disease in the sense that it is contagious, infectious or organic, rather than functional or structural. Having in mind the broad remedial design of the statute, it is my conclusion that such technicalities of medical classification are no part of the problem. In one recorded case the injury or disease was a shoulder bursitis found to have resulted from the multitudinous and incessant recurrence of a particular arm motion characteristic of the employment. The court found that condition to be compensable within the meaning of the statute. Bondar v. Simmons Co., 23 N.J. Super. 109 (App. Div. 1952), affirmed 12 N.J. 361 (1953).
In another case the workman complained of effemination and sterility consequent upon countless inhalations of dust particles containing female sex hormones, the circumambience of such particles being a characteristic of the working environment. It was insisted for the workman that his right to recover was at common law and not within the procedures of workmen's compensation. The court rejected his claim at common law and held that compensation applied. Stepnowski v. Specific Pharmaceuticals, Inc., 18 N.J. Super. 495 (App. Div. 1952). In the latter case the court said, respecting the scope of the statute in question (at page 498):
"It seems clear to us that this deliberately comprehensive language includes the disease and injury alleged in the plaintiff's complaint; they arose out of and in the course of his employment and were due to the presence and his inhalation and absorption of stilbestrol dust particles, a cause or condition which was peculiar to the defendant's chemical trade, and to which the plaintiff had been exposed by virtue of his work. Cf. LeLenko v. Wilson H. Lee Co., 128 Conn. 499, 24 A.2d 253 (1942); Sandy v. Walter Butler Shipbuilders, 221 Minn. 215, 21 N.W.2d 612 (1946)."
In the Bondar case, supra, the Appellate Division said:
"Whether a disease is occupational must be decided on the peculiar characteristics of each employment and the effect it has on the individual who suffers from that employment. The evidence *292 in the instant case warrants the conclusion that the bursitic condition from which the plaintiff suffers arose out of and in the course of his employment. It further warrants the conclusion that the disease was characteristic of and peculiar to' his employment. The word `employment,' as used in the statute, is not designed to restrict recovery to employments which are innately dangerous, but is intended to include employments from which a disease arises by reason of the susceptibility of the particular claimant to the deleterious effects of his occupation." (Italics supplied)
The opinion of the Appellate Division in Giambattista v. Thomas A. Edison, Inc., 32 N.J. Super. 103 (1954), accords enlargement to the scope and purpose of the statute before us. The court said, at p. 111:
"The 1949 amendment is deliberately comprehensive in language and scope. It even covers a disease the risk of which is not generally known in the particular employment or where the contraction of it is the result of the individual susceptibility or allergy of the particular employee, so long as it is due to exposure to a cause thereof arising out of and in the course of the employment. Stepnowski v. Specific Pharmaceuticals, Inc., 18 N.J. Super. 495 (App. Div. 1952); Bondar v. Simmons Co., 23 N.J. Super. 109 (App. Div. 1952), affirmed on opinion below, 12 N.J. 361 (1953). It was not, as the respondent suggests to us, designed merely to provide compensation in cases of injury as a result of continuous minimal traumata, which had been held not to amount to an `accident' in such cases as Capuano v. Wright Aeronautical Corp., 134 N.J.L. 339 (Sup. Ct. 1946) and DiMaria v. Curtiss-Wright Corp., 134 N.J.L. 524 (Sup. Ct. 1946). Our broadening legislation is in line with the trend that has been proceeding across the country at a rapid pace for some time to expand occupational disease coverage, eliminate restrictive provisions and substitute a broad definition for schedules or lists, all undergirded by the basic philosophy that the workman should have the benefits of compensation where his ailment factually results from or is contributed to by the risks and incidents of his work. See 1 Larson, Workmen's Compensation Law (1952), § 41.00 et seq. Cf. Bondar v. Simmons Co., supra. In view of the definition in our statute, the proof of a causal connection between working conditions and the harm should be the focal point of the inquiry. See 8 Rutgers L. Rev. 104-105 (1953)." (Italics supplied)
A further observation is in order. In the Stepnowski case there were continuous inhalations of baleful dust, each inhalation being in all probability innoxious in itself. In the Bondar case the claim was for the culminating result of countless identical muscular activations, each being in all *293 probability harmless in itself. In the case before us there is the cumulative effect, upon the "susceptibility of the particular claimant," of long and frequently repeated episodes of special bodily strain, peculiar to the requirements of the work, and each episode in itself being doubtless incapable of effectuating the result ensuing from all the episodes together. It can make no difference, as I see it, in view of the statutory design, whether in the disorder from which the workman suffers it is the male genital function that is gradually undone as in the Stepnowski case, or whether it is a shoulder bursa that becomes gradually inflamed as in the Bondar case, or whether, as here, it is the scar of a healed surgical incision that is gradually disintegrated so as to cause and permit the extrusion of intestinal gut through the abdominal wall. Again, the technicalities of medical classification are not involved.
It would appear from an examination of the cases that the petition before us, in its claim of hernial disease under the statute, is novel in this State. Though there are hernial disease cases elsewhere that are in harmony with the present conclusion, I believe that upon a comparative appraisal our own decisions are in themselves clearly adequate authority for the principles here applied. Lieberman v. William P. Powers Co., 56 F.2d 443 (D.C.S.D.N.Y. 1931); Mills' Case, 258 Mass. 475, 155 N.E. 423 (Sup. Jud. Ct. 1927); Harrington's Case, 285 Mass. 69, 188 N.E. 499 (Sup. Jud. Ct. 1933); Alpert v. J.C. and W.E. Powers, 223 N.Y. 97, 119 N.E. 229 (Ct. App. 1918); Marathon Paper Mills Co. v. Industrial Comm. of Wisconsin, 203 Wis. 17, 233 N.W. 558 (Sup. Ct. 1930).
I find 10% of total permanent disability in lieu of surgery.